UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No: 25-CR-497(PAM/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **MOTION TO** |
| | ) | **DISCLOSE GRAND JURY** |
| v. | ) | **TESTIMONY** |
| | ) | |
| JUAN CARLOS RODRIGUEZ ROMERO, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant, Juan Rodriguez Romero, by and through counsel Bruce D. Nestor of De León and Nestor, LLC states as follows in support of his Motion to Disclose Grand Jury Testimony pursuant to Fed. R. Crim. Pro. 6(e)(3)(E)(ii):

INTRODUCTION

Mr. Rodriguez Romero ("Rodriguez") is charged by Indictment with three counts of Assault on a Federal Officer under 18 USC §111(a)(1) and (b). All three counts arise from events which occurred on December 21, 2025. Based on the Government's disclosures to date, it appears that the allegations against Mr. Rodriguez are based on statements made by federal immigration agents regarding their attempt to detain Mr. Rodriguez for civil immigration violations on December 21, 2025, and the allegations are not otherwise supported by video surveillance or body camera footage.

Although the recorded statements of federal immigration agents are contradictory and inconsistent, it appears from the statements disclosed by the Government that the Government generally alleges a sequence of events as follows:

1

Initially, federal agents ran the license plate number of a running vehicle in the parking lot of the Westminster Apartments, identified the vehicle as belonging to Mr. Rodriguez, and determined he was "amenable" to arrest as a person legally paroled into the United States who was currently in removal proceedings before the Executive Office of Immigration Review ("EOIR") with a scheduled immigration court date. Agents observed Mr. Rodriguez enter his vehicle, depart the parking lot, and then initiated a traffic stop a few blocks from the Westminster Apartments. Mr. Rodriguez initially stopped his vehicle. Federal agents positioned their vehicles to block him in, exited their vehicles and gave instructions for Mr. Rodriguez to turn off and exit his vehicle. When Mr. Rodriguez did not turn off and exit his vehicle, the agents began an attempt to break the window on his vehicle at which time Mr. Rodriguez drove off. These events form the basis of Count I of the Indictment.

Agents followed Mr. Rodriguez, who looped around the block and returned to the parking lot of the Westminster Apartments. Upon entering the parking lot, Mr. Rodriguez lost control of his vehicle, struck two parked cars, and came to a stop. Federal agents again exited their vehicles, surrounded Mr. Rodriguez's vehicle, and drew their firearms. Mr. Rodriguez then drove away deeper into the parking lot. During this second incident, Deportation Officer (DO) Ibanez discharged his firearm in the direction of Mr. Rodriguez's vehicle. These events form the basis of Count II of the Indictment.

After losing control of his vehicle, Mr. Rodriguez drove to an area of the parking lot outside the common door of his apartment building which led to his unit and stopped his vehicle. Federal agents driving a white Dodge Durango then came into contact with

the rear of Mr. Rodriguez's vehicle. Mr. Rodriguez's front end and/or driver side of his vehicle then came into contact with a blue Ford Expedition driven by other federal agents, pinning DO Ibanez between Mr. Rodriguez's vehicle and the blue Ford Expedition. Based upon representations of the Government, Mr. Rodriguez is not charged with any crime as a result of this third incident.[1]

With respect to the events underlying Count I, the federal agents involved have given contradictory and inconsistent statements as to whether Mr. Rodriguez's vehicle physically struck DO Ibanez who is identified as the "victim" in Count I. Count I, unlike Count II of the Indictment, does not allege that Mr. Rodriguez "caused physical contact and inflicted bodily injury with a dangerous weapon." A X/Twitter Post by the Department of Homeland Security (@DHSgov) at 7:22 p.m. on December 21, 2025, however, alleges that Mr. Rodriguez "drove off [from the initial traffic stop], striking one of the officers in his attempt to escape." Mr. Rodriguez seeks disclosure of grand jury testimony with respect to Count I to determine whether the Government failed to present exculpatory evidence directly negating guilt, and/or presented grand jury testimony which is consistent with the DHS X/Twitter Post of December 21, 2025, which the Government now believes to be false testimony.

With respect to the events underlying Count II, the federal agents involved have also given contradictory and inconsistent statements. In general, the statements of the

---

[1] Following the vehicle collision, Mr. Rodriguez exited his vehicle and entered the apartment building. He was then detained by federal agents is alleged to have bitten the hand of DO Baldwin, which forms the basis for Count III of the Indictment. The factual basis for Count III is not relevant to this Motion to Disclose Grand Jury Testimony.

federal agents involved seem to consistently not allege that Mr. Rodriguez's vehicle had physical contact with a government vehicle or that he "rammed" his car into a government vehicle. The DHS X/Twitter post of December 21, 2025, however, states with respect to the second incident that "Romero began ramming his car into an ICE vehicle and struck ANOTHER ICE officer." Mr. Rodriguez seeks disclosure of grand jury testimony with respect to Count II to determine whether the Government presented grand jury testimony which is consistent with the DHS X/Twitter Post of December 21, 2025, which the Government now believes or knew at the time to be false testimony. Mr. Rodriguez further seeks to determine whether the Government presented testimony to the grand jury with respect to the contact between vehicles during the third incident described above, which it now believes to be false or knew at the time to be false and which would have provided a substantial basis for the grand jury to infer that Mr. Rodriguez had the intent to assault federal agents when he drove off from the first traffic stop as well as when he drove off from the second incident that occurred when he re-entered the parking lot of his apartment building.

LEGAL STANDARD

Fed. R.Crim.Pro. 6(e)(3)(E)(ii) provides for the release of grand jury testimony "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." A defendant seeking disclosure must demonstrate a "particularized need," and whether to permit such disclosure is within the sound discretion of the trial judge. *United States v. Benson*, 760 F.2d 862, 864 (8th Cir.) (per curiam), *cert. denied*, 474 U.S. 858, 88 L. Ed. 2d 137, 106 S. Ct. 166 (1985).

A District Court may not dismiss an otherwise valid indictment simply because the Government failed to disclose to the grand jury "substantial exculpatory evidence" in its possession. *United States v. Williams*, 504 U.S. 36 (1992). Dismissal of an indictment may be appropriate upon a showing of prosecutorial misconduct involving the presentation of false testimony to the grand jury upon a showing of actual prejudice to the accused. *United States v. Wilson*, 565 F.3d 1059, 1070 (8th Cir. 2009).

ARGUMENT

A total of six Deportation Officers (DOs) were involved in the incidents of December 21, 2025, resulting in the charges in Count I and Count II of the Indictment. DO Morales, the team leader of the group, and DO Ibanez were traveling in a blue Ford Expedition. A second group, consisting of DO Trombino, DO Baldwin, DO Gamboa, and DO Chan, were traveling in a white Dodge Durango.

**First Incident** - After Mr. Rodriguez's arrest, DO Morales was interviewed by two Homeland Security Investigation (HSI) agents on December 21, 2025, at the Whipple Federal Building, beginning at 9:47 a.m. He stated that he and DO Ibanez initiated the traffic stop of Mr. Rodriguez. DO Morales and DO Ibanez exited their vehicle and approached the driver side door of Mr. Rodriguez's vehicle, while the four DOs in the white Durango also exited their vehicle and were standing outside of Mr. Rodriguez's vehicle. DO Morales did not state that DO Ibanez, or any other federal agent, was struck by Mr. Rodriguez's vehicle when he drove off from this first traffic stop. He described Mr. Rodriguez's vehicle as "almost hitting" DO Ibanez when Mr. Rodriguez drove away. DO Morales stated that after Mr. Rodriguez drove away, he and

5

DO Ibanez re-entered their vehicle and followed Mr. Rodriguez. During this period, DO Morales does not describe any statements made by DO Ibanez that he had been struck by Mr. Rodriguez's vehicle.

On February 13, 2026, almost two months after the incident resulting in the arrest of Mr. Rodriguez, it appears that DO Ibanez was interviewed for the first time regarding the events of December 21, 2025.  During an interview with HSI Agent Raiff, DO Ibanez stated he was struck by the "side mirror of the driver's side" of Mr. Rodriguez's vehicle when Mr. Rodriguez drove off. He stated he was struck in the shoulder and that he experienced a pain level of three on a scale of 1 to 10. He stated that he told his team leader, DO Morales, that Mr. Rodriguez "just him me with the vehicle" and that he made this report to DO Morales as his team leader "just in case you know anything needs to be reported."

The four DOs in the white Durango were also interviewed by HSI agents on December 21, 2025. DO Trombino stated that she observed that Mr. Rodriguez's "vehicle drove away" and did not mention observing DO Ibanez being struck by Mr. Rodriguez's vehicle. DO Chan stated that he was in the back seat of the white Durango and "could not see much." DO Gamboa "stated that the target vehicle drove off "and went [back] to the apartment complex. DO Gamboa did not mention observing DO Ibanez being struck by Mr. Rodriguez's vehicle. DO Baldwin gave the most detailed statement. He stated that Mr. Rodriguez attempted to flee the first traffic stop and struck DO Ibanez. DO Baldwin stated he saw DO Ibanez staggering and grabbing his lower body/abdomen area.

6

As noted above, in Count I the Government has not charged that Mr. Rodriguez assaulted a federal agent "and caused physical contact and inflicted bodily injury." The lack of such an element in the charge directly contradicts the statements of DO Ibanez, the identified victim of Count I, and the graphic statement of DO Baldwin that he saw DO Ibanez "staggering and grabbing his lower body/abdomen area." Further, such a charging decision to not include "causing physical contact" as an element of the charged offense directly contradicts the DHS X/Twitter post of December 21, 2025, which claims Mr. "Rodriguez drove off, striking one of the officers in his attempt to escape."[2]

Based on this series of contradictory statements, and the Twitter/X post from DHS, counsel is utterly unable to determine how the Government presented this matter to the grand jury. Because Mr. Rodriguez is not charged in Count I with causing "physical contact," it appears that the Government may not have made such an allegation before the grand jury. The failure to present such an allegation, however, would be directly contrary to statement of the "victim" on February 13, 2026, the X/Twitter post of DHS on December 21, 2025, and the statement of DO Baldwin on December 21, 2025.

Moreover, in the absence of a claim that Mr. Rodriguez struck DO Ibanez with his vehicle, the evidence that Mr. Rodriguez attempted to assault DO Ibanez by the manner in which he drove his vehicle (although he did not strike DO Ibanez) is entirely unclear.

---

[2] On December 21, 2025, the interview of DO Ibanez conducted on February 13, 2026, had not yet been completed. Thus, the only information that DO Ibanez was struck during this first incident would have been the statement of DO Baldwin, which was directly contradicted by the statement of DO Morales and inconsistent with the observations of DO Trombino and DO Gamboa who did not claim to have seen DO Ibanez be struck by Mr. Rodriguez's vehicle.

During his interview by HSI agents on December 21, 2025, DO Gamboa describes that after the first traffic stop, Mr. Rodriguez "just began to slowly pull out and continue driving." Such a description is not consistent with Mr. Rodriguez operating his vehicle in a manner intended to strike DO Ibanez but being unable to do so. As such, Mr. Rodriguez maintains for purposes of this Motion to Disclose Grand Jury Testimony, that the presentation of evidence to the grand jury which the Government now believes to be false, or believed to be false at the time, and which would have supported an inference that Mr. Rodriguez had the purpose of assaulting DO Ibanez, would have caused prejudice to Mr. Rodriguez and would support a Motion to Dismiss at least Count I of the Indictment. Mr. Rodriguez develops this argument, with respect to improper evidence presented to the grand jury that would support an inference of a purpose by Mr. Rodriguez to commit an assault, with respect to the events of the third incident, discussed below.

**Second Incident** – The X/Twitter post by DHS on December 21, 2025, claims that during the second incident involving Mr. Rodriguez and federal agents, Mr. Rodriguez lost control of his vehicle upon entering the apartment building parking lot and "began ramming his car into an ICE vehicle." This claim is not supported by the statement of any federal agent who was involved in the events of December 21, 2025. In Count II, the Government does charge that Mr. Rodriguez committed an assault and "caused physical contact and inflicted bodily injury." It is entirely unclear if this means that the Government is adopting the statements in the X/Twitter post by DHS that Mr.

8

Rodriguez "rammed" an ICE vehicle or based such a charging decision on other factual grounds.

As noted above, DO Morales and DO Ibanez were traveling together in the same vehicle on December 21, 2025. DO Morales described DO Ibanez as his "best friend." In his statement given to HSI agents on December 21, 2025, DO Morales completely fails to describe this second incident or claim that he observed DO Ibanez be struck during such an incident. DO Morales does describe Mr. Rodriguez re-entering the parking lot of the apartment complex, losing control and striking two parked vehicles. DO Morales then jumps directly to the third incident which occurred deeper into the parking area and outside the common door to the building which leads to Mr. Rodriguez's apartment. DO Morales states that Mr. Rodriguez came to a stop in the parking lot. DO Morales and DO Ibanez exited their vehicle, with DO Ibanez standing in front of Mr. Rodriguez's vehicle. Mr. Rodriguez then "backs up," strikes the white Dodge Durango which had arrived on the scene, and then accelerates forward, striking the blue Ford Expedition and "pinning" DO Ibanez between the two vehicles. At this point, DO Morales claims to hear "two shots." Mr Rodriguez then exits his vehicle, and enters the apartment building, where he is eventually arrested.

This statement by DO Morales is entirely inconsistent with the statements of all other federal agents present, who describe the shots being fired by DO Ibanez during the second incident and not being fired in conjunction with DO Ibanez being "pinned" between Mr. Rodriguez's vehicle and the blue Ford Expedition during the third incident.

9

As of the date the Indictment was filed, December 30, 2025, DO Ibanez had not yet been interviewed by HSI agents.[3] The only photograph of any injuries suffered by DO Ibanez disclosed by the Government is a photo of his finger, which the Government now contends was injured during the third incident as a result of being pinned between Mr. Rodriguez's vehicle and the blue Ford Expedition. The Government has disclosed no medical records that DO Ibanez suffered "bodily injury" during the second incident, as charged in Count II. No other federal agent claims that DO Ibanez suffered physical injury during this second incident, although several do state that DO Ibanez was contacted by Mr. Rodriguez's vehicle as DO Ibanewz discharged his firearm. Thus, it is entirely unclear to counsel the evidence that would have been presented to the grand jury as to DO Ibanez suffering "bodily injury," unless it presented to the grand jury the statements of DO Morales which skips over the second incident and conflates the discharge by DO Ibanez of his firearm with the events occurring during the third incident.

**Third Incident** – As noted above, the Government has represented that Mr. Rodriguez is not charged with any crime as a result of his conduct during the third incident of December 21, 2025, during which his vehicle had physical contact with the white Dodge Durango, the blue Ford Expedition, and DO Ibanez suffered an injury to his finger. It appears, therefore, that the Government is discounting the statement of DO Morales, that Mr. Rodriguez placed his vehicle into reverse and struck the white Durango, then accelerated forward, striking the blue Ford Expedition and pinning DO Ibanez between two vehicles resulting in an injury to his hand. The lack of credibility

---

[3] At least no reports of such an interview have been disclosed.

given to DO Morales may be because two other DOs, who were inside the white Durango, directly contradict DO Morales' statement. DO Gamboa describes the white Durango as running into the back of Mr. Rodriguez's vehicle "because he abruptly stopped." DO Trombino, states, "the vehicle I was in [the white Dodge Durango] struck the target vehicle from behind." All parties agree that the roads and parking area were icy and slippery on December 21, 2025, which is consistent with the white Durango being unable to stop and sliding into Mr. Rodriguez's vehicle. That collision then pushed Mr. Rodriguez's vehicle into the blue Ford Expedition, pinning DO Ibanez and injuring his hand.

The only statement to support the claim in the X/Twitter post by DHS that Mr. Rodriguez "began ramming his car into an ICE vehicle" is the statement by DO Morales that Mr. Rodriguez engaged in such conduct immediately before DO Ibanez discharging his firearm. No other government witness makes a claim that Mr. Rodriguez "rammed" a government vehicle at any time. It now appears that the Government discounts the statement of DO Morales and believes he was either confused, not telling the truth, or both. However, the testimony of DO Morales of Mr. Rodriguez "ramming" two government vehicles would be the strongest evidence of Mr. Rodriguez having the purpose of making physical contact and assaulting a federal agent on December 21, 2025. All of the other alleged conduct of Mr. Rodriguez is entirely consistent with an attempt to return to the safety of his apartment when confronted by masked, armed men who attempt to break his car windows and shoot at him.

11

CONCLUSION

Mr. Rodriguez contends that he has made a sufficient showing that testimony was presented to the grand jury which was false, and which the Government either knew to be false at the time or now believes to be false, that "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." F.R.C.P. 6(e)(3)(E)(ii). The individualized showing that false testimony was potentially presented to the grand jury is only made stronger by the pattern of behavior demonstrated by federal agents over the course of aggressive federal immigration enforcement in Los Angeles, Chicago and Minnesota over the past eight months. Federal agents have a well-established track record of making false statements to enable, justify, and cover up their misconduct. For example, Judge Sara Ellis, who heard testimony and received evidence related to DHS' First Amendment violations in Chicago, determined that DHS agents and officials made false statements and lacked credibility. *See, e.g., Chicago Headline Club, et al. v. Noem, et al.*, No. 25 cv 12173, 2025 WL 3240782, at *9-13 (N.D. Ill. Nov. 20, 2025) (documenting numerous false statements under oath by ICE agents and officials).[4] Similarly, ICE agents have lied to federal investigators in the District of Minnesota,

---

[4] *See also* Jon Seidel, *Tracking every known federal prosecution in Chicago tied to Trump's immigration blitz*, Chicago Sun-Times, February 18, 2026, (available at https://chicago.suntimes.com/2026/tracker-federal-prosecutions-chicago-status-trumps-immigration-blitz-ice) (recording that of thirty-two federal cases brought in Chicago alleging assault on a federal officer, three had been rejected by the grand jury, one had resulted in acquittal, and fourteen others had been voluntarily dismissed by the government, and no defendants had been convicted).

resulting in the procurement of arrest warrants and filing of criminal charges based on these lies.[5]

Accordingly, Mr. Rodriguez Romero asks that this matter be set for hearing, and that upon hearing, the Court order the release of all grand jury testimony presented by the Government to obtain the Indictment in this matter.

Date: <u>February 25, 2026</u>              <u>      S/BRUCE D. NESTOR      </u>
Bruce D. Nestor, 0318024 – MN
DE LEÓN & NESTOR, LLC
3547 Cedar Avenue South
Minneapolis, MN  55407
(612) 659-9019
(612) 436-3664 – Facsimile
nestor@denestlaw.com

ATTORNEY FOR JUAN RODRIGUEZ ROMERO

---

[5] *See, e.g.,* Government's Motion to Dismiss Complaint with Prejudice, *United States v. Aljorna*, Case No. 26-mj-23, ECF No. 48 (D. Minn., filed Feb. 12, 2026) ("Newly discovered evidence in this matter is materially inconsistent with the allegations in the Complaint Affidavit, filed on January 16, 2026, as ECF 1-1, as well as the preliminary-hearing testimony (ECF 18, 19) that was based on information presented to the Affiant [by ICE agents]."); Government's Motion to Dismiss, *United States v. Youssouf*, Case No. 26-mj-85, ECF No. 23 (D. Minn., filed Feb. 18, 2026) (voluntarily dismissing case where affidavit supporting complaint stated agents told investigator that defendant had violently assaulted them, including kicking and punching them); Government's Motion to Dismiss, *United States v. Collyard*, Case No. 25-mj-854, ECF No. 20 (D. Minn., filed Jan. 20, 2026) (voluntarily dismissing case where agents told investigator defendant had threatened to kill officers and tackled officer); Minute Entry, *United States v. Espinoza-Espinoza*, Case No. 26-mj-30, ECF No. 10 (D. Minn., dated January 26, 2026) (recording government motion to dismiss complaint where affidavit supporting complaint stated agents told investigator that defendant rammed agents with his car, injured agents and resisted arrest).

13