UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                   )
  United States of America,        )  File No. 25-cr-497
                                   )        (PAM-ECW)
          Plaintiff,               )
                                   )  Courtroom 8E
  vs.                              )  Minneapolis, Minnesota
                                   )  January 8, 2026
  Juan Carlos Rodriguez Romero,    )  2:41 p.m.
                                   )  **DIGITAL RECORDING**
                                   )
          Defendant.               )
------------------------------------------------------------

BEFORE THE HONORABLE DULCE J. FOSTER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(DETENTION HEARING)**

**APPEARANCES**

| | |
|---|---|
| For the Plaintiff: | United States Attorney's Office<br>Syngen Kanassatega, AUSA<br>316 North Robert Street<br>Suite 600<br>Minneapolis, Minnesota 55101 |
| For the Defendant: | De Leon & Nestor LLC<br>Bruce Nestor, ESQ.<br>3547 Cedar Avenue South<br>Minneapolis, MN 55407 |
| Transcriber: | Lynne M. Krenz, RMR, CRR, CRC<br>Suite 146<br>316 North Robert Street<br>St. Paul, Minnesota 55101 |
| Interpreter: | Esperanza Lopez-Dominguez,<br>Spanish |

Proceedings recorded by digital recording; transcript produced with computer.

<u>**I N D E X**</u>

PAGE

**TERRY GETSCH**
  Direct Examination by Mr. Kanassatega          4
  Cross-Examination by Mr. Nestor               13

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present)

THE COURT:  Okay.  So now we will proceed to the detention portion of the hearing.

Are you still seeking to detain Mr. Rodriguez Romero?

MR. KANASSATEGA:  The government is, Your Honor.

THE COURT:  All right.  Mr. Nestor, are you contesting the question of detention?

MR. NESTOR:  Yes.

THE COURT:  Okay.  Does the government claim that this is a rebuttal presumption case?

MR. KANASSATEGA:  It does not, Your Honor.

THE COURT:  Okay.  All right.

Are you offering any evidence in support of your motion for detention?

MR. KANASSATEGA:  Your Honor, I'm only offering the testimony of FBI Special -- Special Agent Terry Getsch.

THE COURT:  Okay.  You may call your first witness then.

Please raise your right hand, sir.

You do solemnly swear to tell the truth in these proceedings then do you affirm that you will be the truth,

the whole truth and nothing but the truth, so help you God.

THE WITNESS:  Yes, Your Honor, I do.

THE COURT:  All right.  Please state your full name and spell your last name for the record.

THE WITNESS:  Special agent Terry, T-E-R-R-Y, Getsch, G-E-T-S-C-H.

THE COURT:  All right.  You may proceed, Mr. Kanassatega.

MR. KANASSATEGA:  Thank you, Your Honor.

**(Terry Getsch)**

**DIRECT EXAMINATION**

BY MR. KANASSATEGA:

Q.  Special Agent Getsch, can you tell the Court, where do you work?

A.  I'm currently employed as a special agent with the Federal Bureau of Investigation.

Q.  And how long have you been a special agent with the FBI.

A.  Coming out of eight years.

Q.  How long have you been a law enforcement officer?

A.  Since approximately 2014.  I was a police officer and detective for approximately four years before that.

Q.  And what are -- what are your duties and responsibilities?

A.   I currently am assigned to the violent crimes squad, so we generally investigate any type of violent crime to include assault of federal law enforcement officers, that is, a federal investigation by FBI.

Q.   Are you the primary case agent in this case?

A.   No, I am not.

Q.   Are you assigned in any way to this case?

A.   I have been assigned for the purposes of this hearing.

Q.   Would it be fair then to say that you're not familiar with every fact of this case?

A.   Yes, sir.

Q.   Nevertheless, am I correct in understanding that your testimony today will be based on your review of other law enforcement officers' reports?

A.   Yes.

Q.   And also your conversations with other case agents associated with this case?

A.   Yes, sir.

Q.   And your overall review of the case and your testimony today is simply for the purpose of aiding the Court in determining the issue of whether to detain Mr. Rodriguez Romeo.

A.   Yes, sir.

Q.   Special Agent Getsch, I'd like to turn to the events that occurred on the morning of December 21st, 2025.  Which

federal law enforcement agency was present in a parking lot at an address around 1384 Westminster Street in St. Paul?

A.    A deportation officer is an officer assigned to enforcement and removal operations under the Immigrations and Custom Enforcement.

Q.    And what kind of residential structure is next to that parking lot?

A.    It's a very directly adjacent to that apartment. Parking lot is an apartment complex.

Q.    And what prompted enforcement and removal operations presence in that parking lot?

A.    They were conducting an operation attempting to locate an unrelated individual who I believe was subject to removal proceeding.

Q.    And how did those officers identify Mr. Rodriguez-Romero?

A.    They were located a white Toyota 4Runner that was parked in the parking lot -- or near or in the parking lot of the complex.  The vehicle was registered to Mr. Romero through database tracks and communication with their joint operations center.  They were notified that Mr. Romero, if located, should be detained because he was subject to removal.

Q.    And what country is Mr. Rodriguez-Romero a citizen of?

A.    To my understanding, Cuba.

Q.  After officers identified Mr. Rodriguez-Romero and received that information, what did officers observe after that point?

A.  Sure.  While we waited, they observed Mr. Romero driving his white 4Runner from the complex and they followed that vehicle.  They were in three DHS vehicles, some of them were rental vehicles.  So this primary vehicle was a DHS vehicle that was equipped with emergency equipment such as emergency lights in an unmarked capacity.

They followed the vehicle from the complex for several blocks and then they initiated a traffic stop on that vehicle.

Q.  And what did officers do after they initiated the traffic stop?

A.  In setting up for the traffic stop the supervisor, Morales, was driving a blue Ford Expedition SUV.  He initiated the stop with his emergency lights and I believe his siren.  The vehicle came to rest.  Mr. Romero stopped in his vehicle on the side of the road.  Mr. Morales then positioned his vehicle at a roughly a 45-degree angle in front of the stopped vehicle so as to prevent any egress or flight of the vehicle if the vehicle decided to flee.

Vehicle 2 was a white come Durango.  It positioned approximately six feet behind Mr. Romero's vehicle and was essentially the second vehicle for the traffic stop.  At

that point officers got out on foot. The officers that were there -- there was a total of approximately nine enforcement and removal officers between three vehicles. They were wearing some overt police -- or law enforcement markings identifying them as law enforcement and the emergency equipment was activated on that first vehicle, and they approached Mr. Romero's vehicle.

Q.   And how did they identify themselves to Mr. Rodriguez-Romero?

A.   They identified themselves as law enforcement and that -- they informed Mr. Romero that he was under arrest for -- simply to the effect of an immigration-related matter.

Q.   And how did Mr. Rodriguez-Romero respond to officers?

A.   They attempted to get him to open the door or roll down his window, to my recollection, and he did not do that. He appeared to be nervous and clenching the steering wheel. They attempted to break the window to remove him from the vehicle but were unsuccessful at breaking the window.

Around this time the wheels of the vehicle turned to the right. The vehicle was placed into reverse and backed up, nearly striking or driving towards the vicinity of officers that were behind the vehicle, and then the vehicle drove forward to leave and flee from the vicinity of the traffic stop.

THE COURT:  Could you -- I'm sorry.

THE WITNESS:  Yes, ma'am.

THE COURT:  You're speaking a little quickly.

THE WITNESS:  Yes, ma'am.

THE COURT:  I'm having a little hard time understanding you.  If you could just say that again and go a little slower.

THE WITNESS:  Yes, ma'am.

So Mr. Romero turned the wheels to the right, placed the vehicle in reverse and started backing up, attempting to evade or get around the vehicles that were placed, one behind and one front of him.

There was officers that essentially had to move out of the way when in the vicinity of him as he backed up and then he started to proceed to drive forward to get away from those vehicles and flee the vicinity of the stop.

During this time, Mr. Romero's vehicle was seen hitting a Officer Ibanez.  One of the additional officers there observed this and he then observed Mr. Ibanez appearing to stagger and clench his stomach or abdomen area as if he had just incurred an injury.  And then the officers initiated a pursuit based off of what had just occurred, their reason for detaining him, and the potential assault that had just occurred.  They initiated a pursuit and they pursued Mr. Romero as he left the scene.

Q.  And how fast was Mr. Rodriguez-Romero traveling in that

4Runner?

A. It's a residential neighborhood and my understanding is they assessed the speed to be in the vicinity of 50-to-60-miles an hour, a high rate of speed. It's winter time as well. And during the pursuit they observed Mr. Romero lose apparent control of the vehicle and fishtail the vehicle and then ultimately the side -- hit or strike two other parked third-party vehicles.

Q. Now, before we get into what you just described as the collision with two bystander vehicles, where did this pursuit ultimately end?

A. Back at the apartment complex.

Q. And is that where these two bystander vehicles were located?

A. In the vicinity of the apartment complex. Yes, sir.

Q. After Mr. Rodriguez-Romero's vehicle collided with those two bystander vehicles, what happened after that?

A. He eventually came to -- he came to a stop and they -- Officer Morales caught up. He had lights on and was pursuing him. He pulled again -- pulled in front of the -- of Mr. Romero's vehicle and positioned it, again, to prevent additional egress at a approximately a 45-degree angle in front of his vehicle, and a Vehicle 2, the Durango, pulled up behind Mr. Romero 's vehicle.

Officers -- the vehicles that were essentially

moving trying to position to block him, additionally at least two officers exited the vehicle and approached towards the front of Mr. Romero's vehicle with their weapons drawn. Officer Ibanez and Officer Trombino -- I believe was their names.  They were generally in the front of the vehicle. Mr. Romero's vehicle continued to try to flee and then drove towards -- striking Officer Ibanez and pushing him to the ground.  At this time, Officer Ibanez [indiscernible] to have discharged his firearm at least twice into the engine block or generally in the vicinity of the vehicle as it was going towards him.  The vehicle then -- and standing in front of the vehicle as well was Officer Trombino.  The vehicle also backed up and -- essentially to be backing up as the time the Durango was also pulling forward and they had a collision between both those vehicles.  And then the vehicles started -- or continued to attempt to flee and struck Officer Morales's vehicle and essentially struck the side or the I believe of the front quarter panel area of Officer Morales's vehicle.

Shortly -- a while later, Mr. Romero got out of the vehicle and then fled on foot and fled into the apartment complex kind of through a entryway vestibule-type area.

Q.  And how did officers respond to that?

A.  At least three officers pursued him inside.  There was

law enforcement commands given to him to comply with the arrest, given both in English and in Spanish.

They proceeded him through the doorway. He was not complying with them. He was continuing to flee and he was forcibly taken to the ground by the Officer Morales, Officer Baldwin and Officer Trombino. He was not complying with them, was not complying with commands to give his hands. He actually elbowed them multiple times. He elbowed -- he used his elbows to strike Officer Morales.

At this time, Officer Baldwin attempted to essentially utilize pressure points to gain compliance from Mr. Romero and found pressure points in the vicinity of his head and his hands slipped in front of Mr. Romero's face and Mr. Romero clenched down and bit the webbing of Officer Baldwin's left hand, actually piercing the skin and causing blood to come out.

They continued to essentially fight with Mr. Romero until they got him restrained. Subsequently after that occurred they continued to have other issues they documented with Mr. Romero. But then the two officers, Officer Ibanez, who had been struck at the first traffic stop and additionally was struck and pushed to the ground and discharged his weapon, went to go receive medical attention; and Officer Baldwin, who had been bitten, went to go seek medical attention. My understanding, the wounds

that they occurred was -- the hospital identified as a human bite wound to Mr. Baldwin's hand, Officer Baldwin's hand, and that Officer Ibanez had a bruised rib and a dislocated finger.

MR. KANASSATEGA:  Your Honor, I have no further questions.

THE COURT:  Cross-examination, Mr. Nestor.

MR. NESTOR:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. NESTOR:

Q.  Is it Special Agent Getsch?

A.  Getsch.

Q.  Getsch.

A.  Yes, sir.

Q.  Special Agent Getsch, my name is Bruce Nestor.  I represent Mr. Rodriguez-Romero.  Good afternoon.

A.  Good afternoon, sir.

Q.  To be clear, you didn't witness any of these events, you just read some reports and that's what your testimony's based on?

A.  I reviewed the reports in review of officers or agents that have been involved in the investigation.  Yes, sir.

Q.  I'm sorry.  In review of officer's --

A.  Oh, in speaking with officers or other agents of the

federal government that have conducted investigation.

Q. And as far as you know, there were four of the officers present on scene on December 21st who were interviewed; is that correct?

A. At least.

Q. Four written reports were produced. The DO -- Deportation Officer Baldwin, a Deportation Officer Morales, and a Deportation Officer Trombino -- and I guess maybe Mr. Baldwin was interviewed twice. Does that sound correct?

A. I believe there was a followup interview with Mr. Baldwin and I believe there was interviews with eight of the nine -- the one that was involved in the use of force or the discharge of a firearm has not been interviewed to date to my knowledge.

Q. Mr. Ibanez has not been interviewed -- or DO --

A. Due to the use of force investigation, my understanding is he has not provided a statement yet.

THE COURT: Wait. I'm sorry. What was the name of that officer?

THE WITNESS: Ibanez.

THE COURT: Ibanez.

BY MR. NESTOR:

Q. And so just -- I've received four reports. Two for Officer Baldwin, one for Officer Morales, one for Officer Trombino?

A.  I did not provide them -- my understanding is those were the only reports that was provided to the United Assistant Attorney's Office.

Q.  And is it your understanding that other officers were interviewed?

A.  Yes, I reviewed other interviews with other officers.

Q.  And were those recorded?

A.  I'm not certain if they were recorded but they were documented.

Q.  In a --

A.  In a report format like the ones you have in front of you.

Q.  Okay.  So you've seen written reports?

A.  Yes, sir, I have.

Q.  Do you know if after this incident the officers were separated or did they continue to have contact with each other?

A.  I am unaware of that, sir.

Q.  You don't know whether the officers involved had an opportunity to basically get their stories to mesh --

A.  They did --

Q.  -- before they were interviewed?

A.  They did.  This incident, I was actually not working.

Q.  Have you seen any video evidence related to this incident?

A.  No, I have not.

Q.  Are you aware of whether any video evidence has been obtained?

A.  I am unaware of any video evidence.

Q.  Are you aware of any efforts to obtain video evidence that were made by law enforcement?

A.  There was a canvas of neighbors and interviews of neighbors and asked for cell phone videos, I believe, and other -- other, like, ringing doorbells, to my knowledge, but I'm unaware of anything that was successfully obtained.

Q.  None of the officers were wearing body cameras?

A.  My understanding is that enforcement rule and operations do not have and do not utilize body cameras.

Q.  Do you know if Mr. Rodriguez-Romero's vehicle was taken into custody for evidence?

A.  I do not know that.  I'm unaware.

Q.  You have not viewed the vehicle?

A.  I have not viewed the vehicle and I did not know if it was actually impounded or if it's been obtained as any type of evidence.

Q.  Have you viewed photographs of whether -- where and whether bullets struck the vehicle?

A.  I have not.

Q.  Have you reviewed any photographs of any of the damage to Mr. Rodriguez-Romero's vehicle?

A.   No.

Q.   Have you reviewed photographs of any damage to the agent's vehicle?

A.   No.

Q.   And my understanding then is Deportation Officer Ibanez, I-B-A-N-E-Z, as in zebra, has been not interviewed?

A.   To my knowledge, no.

Q.   And that deportation officer is the one that was allegedly struck twice by Mr. Rodriguez-Romero?

A.   Yes, sir.

Q.   And that deportation officer is the one that discharged his firearm?

A.   Yes, sir.

Q.   Do you have any knowledge as to whether a firearm was discharged at the initial stop of Mr. Rodriguez-Romero?  Or were you at the second stop?

A.   To my knowledge, only at the essentially second stop or back at the apartment complex, not at the initial traffic stop.

Q.   And do you know if weapons were brandished or displayed by federal officers at what I will call that initial traffic stop before the return to the complex?

A.   I'm unaware, to my recollection, if any firearms were unholstered or if that was documented.  But I do know they attempted to break the window, so they may have had some

type of a glass breaker, something like that.

Q.  What is your understanding as to whether officers were able to observe Mr. Rodriguez-Romero when they initially observed his white Toyota 4Runner?  Was he standing outside of it?  Was he inside of it?  Did he exit the building to enter it?

A.  I do not know specifics of that.

Q.  My understanding from your testimony is that Mr. Rodriguez-Romero was not the initial target of any immigration enforcement activity?

A.  At the time, no, he was not.

Q.  Rather, his vehicle was observed in the parking lot and the license plate was run and it then matched a person of interest?

A.  Yes.  The information that they obtained identified him to be subject to removal.

Q.  Do you know if Mr. Rodriguez-Romero's observed race played any role in the decision to run his license plate?

A.  To my knowledge, not at all.  No, sir.

Q.  Why was his license plate vehicle run?

A.  I believe they were just checking vehicles in the vicinity of where they were looking for another individual, just being proactive.

Q.  Just randomly checking the license plate of any vehicle?

A.  I believe so.

Q.   You indicated there were three vehicles involved in this in terms of the federal law enforcement side?

A.   Yes.  As far as the ERO vehicles, I'm aware of three being involved.

Q.   And I heard you describe the blue vehicle that had law enforcement lights, the white Durango that did not.  Where was the third vehicle during this incident?

A.   It was in the vicinity set up for surveillance or responding as like a third backup vehicle, I believe, generally behind Vehicle 2 as support [indiscernible].

Q.   Do you know what window law enforcement tried to break on Mr. Rodriguez-Romero's vehicle?

A.   I cannot recollect if they specified which window in their reports.

Q.   And in terms of your use of the word "flee" as to describe Mr. Romero's conduct, he drove back to the location where he was initially observed by law enforcement, correct? The parking lot of the apartment complex?

A.   That would not -- no, that would not be why I used term "flee."

Q.   So after he left the initial traffic stop, where did he drive to?

A.   I waive -- my understanding of reviewing the maps and what was documented is he was essentially fleeing away from the complex at first because he was initially, his route of

travel was away from the complex and then he --

THE INTERPRETER:  Your Honor, the interpreter asks that the witness slow down a little bit, please.

THE COURT:  Yeah.

THE WITNESS:  Yes, ma'am.

THE COURT:  Yes.  I --

THE WITNESS:  Yes, Your Honor.  My apologies.

THE COURT:  Yes, I request that you do that, sir.

THE INTERPRETER:  Thank you.

THE WITNESS:  The general direction of travel of Romero's vehicle was away from the complex at the time of the stop.

Initially when Mr. Romero's vehicle fled the location of the traffic stop, my understanding it was going in the general vicinity away but then resultingly took turns to go back to and ended up at the apartment complex.

BY MR. NESTOR:

Q.  So after the first initial traffic stop he took turns, went around the block, and returned to the apartment complex where he was initially encountered by law enforcement?

A.  Yes, sir.

Q.  And your understanding, that's where he lives?

A.  Yes.  That was my understanding.

MR. NESTOR:  I don't have any further questions.

THE COURT:  Any redirect, Mr. Kanassatega?

MR. KANASSATEGA:  No, Your Honor.

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  This is your only witness, correct, Mr. Kanassatega?

MR. KANASSATEGA:  I'm sorry?

THE COURT:  I take that's this is your only witness?

MR. KANASSATEGA:  That's correct, Your Honor.

THE COURT:  Okay.

Mr. Nestor, do you have any witnesses to call?

MR. NESTOR:  I do not, Your Honor.

THE COURT:  Do you have any other evidence?

MR. NESTOR:  Only to present evidence regarding history and characteristics of the defendant by proffer.

THE COURT:  So you have proffers, correct?  Okay. You may go ahead and begin your proffers.

I'll start with you, Mr. Kanassatega.

MR. KANASSATEGA:  Thank you, Your Honor.

The -- there is no condition or combination of conditions that will reasonably assure the safety of any other person or the community.  And the government would like to draw the Court's attention to course to the factors under Section 3142(g), particularly the nature and circumstances of the offense charged, including the

offense -- with this offense being a crime of violence and also the nature and seriousness of the danger to any person or the community if Mr. Rodriguez-Romero is released. The government is mindful of -- is mindful of current events and -- however, Mr. Rodriguez-Romero is a citizen of Cuba and he is subject to removal.

When ICE officers encountered Mr. Rodriguez Romero, he fled three times. He fled from the first traffic stop and he struck an officer as he fled the first stop; and he engaged officers in a high-speed pursuit in a residential neighborhood driving around 50-to-60-miles per hour, placing not only law enforcement officers in danger, but also any community members in that area.

Mr. Rodriguez-Romero also collided into several -- into two vehicles when he returned back to the apartment complex at the end -- towards the end of the pursuit, which also could have endangered other bystanders. Overall, this is how Mr. Rodriguez-Romero responded to being arrested by officers. The government is concerned that Mr. Rodriguez-Romero, if released, could react the same way if he's arrested again in the future.

That is all, Your Honor.

THE COURT: So are you only arguing danger and not risk of flight?

MR. KANASSATEGA: Only danger, Your Honor -- and,

well, risk of flight also because of flight of police officers.

THE COURT: So you are arguing both prongs?

MR. KANASSATEGA: Arguing both prongs.

THE COURT: Okay. Mr. Nestor.

MR. NESTOR: Your Honor, at the -- initially at today's hearing you asked the government whether it was treating this as a presumption case and it was represented to you that the government is not.

My review of the court minutes from the initial appearance were that the court recorded that the government move for detention index under 18 U.S.C. 3142(f)(2), which would be the non-rebuttal presumption cases; which is under the rebuttal -- the cases that trigger the rebuttal presumption are under (f)(1).

THE COURT: I was at that hearing and I heard the argument made under -- that this was a crime of violence.

MR. NESTOR: Again, I was not present at the hearing. I'm only referring to ECF Docket Entry Number 8, which indicates the government moved for detention under 31(f)(2), and then I'm relying on the representations of the government today that it is not claiming it is a rebuttal presumption case.

THE COURT: Well, I was at that hearing and I'm telling you my independent recollection was that an argument

was made that this was a crime of violence.

MR. NESTOR:  Again --

THE COURT:  Yeah.

MR. NESTOR:  It wasn't -- but the government clearly represented at the start of the day it was not treating it as a rebuttal presumption case.

THE COURT:  Yes.  That -- that I heard.

MR. NESTOR:  In which case the only other basis for the government to move for detention would be under (f)(2), and that requires proof of (f)(2)(A), a serious risk that such person will flee, which I will address, that I don't believe the government has met; or (B), not mere danger to the community but a serious risk that such person will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to threaten, injure or intimidate a prospective witness or juror.

And in its summary as to why it was seeking detention of Mr. Romero, I did not hear the government address anything that would establish a risk that he would obstruct justice or threaten, injure or intimidate a prospective witness or a juror.  The government merely argued some generalized danger of the community, which is not an appropriate factor supporting detention when the government moves under (f)(2) for detention.

That being said, I will speak generally to our

belief that there are conditions --

THE COURT:  Yeah, please do address the factors --

MR. NESTOR:  I will.

THE COURT:  The general factors under (f)(1).

MR. NESTOR:  That's my next point.

THE COURT:  Yeah.

MR. NESTOR:  And just -- I think it's important that the government, when moving for the detention and deprivation of liberty, specifies the basis that they're doing so.

THE COURT:  Great.

MR. NESTOR:  And presents evidence that fulfills the factors that, you know, whether it's an (f)(2) or an (f)(1) motion.

That being said, I will proffer that Mr. Rodriguez-Romero is a 54-year old Cuban national.  He is married to Mirielys Martinez Carracedo.  I can spell that if the court reporter would like -- or I guess this is being recorded, right?

THE COURT:  Yes, this is being recorded.

MR. NESTOR:  Who is also a Cuban national.  They have been married for six years and in a relationship for twelve.  I spoke to her and conferred -- confirmed with her the information I'm proffering to you today.

I also had reached out to probation earlier this

morning, but too late for them to reach out to her or to interview Mr. Rodriguez-Romero.

Prior to his arrest, Mr. Rodriguez-Romero was living with his wife and two minor children at 1350 Westminster Street in St. Paul, Minnesota, as reflected in the bond report.  He had been living there since June or July of 2025.

His six-year-old daughter is enrolled at Mississippi Creative Arts in St. Paul.  His 14-year-old son attends Washington Technical Middle School in St. Paul.  And he has a 24-year-old adult son attending college in California.

Prior to his arrest on December 21st, Mr. Rodriguez-Romero was working intermittently for DoorDash as his primary employment ended when Immigration and Naturalization Services terminated his work authorization. He had been employed when he had a work authorization with Masterson Personnel working at Catallia Mexican Foods in Eagan, Minnesota.

Mr. Rodriguez-Romero, his wife, and all three of their children legally entered the United States in August of 2024 using what is called a CBP-1 application.  The CBP-1 application was a program established by the United States Government under the administration of President Joseph Biden to regularize the entry of people to the United States

who wish to seek asylum.  Basically while the family of Mr. Rodriguez-Romero was waiting in Mexico, he filled out an application, got an appointment to eventually come to a port of entry and was paroled into the United States.  He was granted parole for a period of two years and was granted work authorization.  In other words, he is a legal entrant to the United States, even if he lacks permanent or lawful immigration status at this time.

It is true that upon the change in presidential administration the previous promises made to Mr. Rodriguez-Romero were revoked.  His work authorization and parole status were taken away.

He remains, however, eligible to apply for legal permanent resident status in the United States.  He's a Cuban national paroled into the United States who has been physically present in the United States for more than one year, so under the Cuban Adjustment Act he is eligible to submit an application for legal permanent resident status, as is his wife and three children.

In fact, were Mr. Rodriguez-Romero not in custody at this moment, he would be attending a medical exam with the USCIS-approved civil surgeon because a requirement of applying for his green card is to submit a completed medical exam.  His wife is currently attending that medical exam. The paperwork has been prepared and it was in process.

I bring all this forth not to dwell on it, but --

THE COURT:  Because this is not an illegal reentry.

MR. NESTOR:  He has an incentive to appear --

THE COURT:  Yeah.

MR. NESTOR:  -- because he is eligible for permanent status in the United States.

THE COURT:  Yes.

MR. NESTOR:  And it's not an illegal -- and I say that and I -- with all respect to the bond report, I object to it characterizing him as an illegal alien.  That's both incorrect as a matter of law, I believe, and an offensive term.

And with respect to his arrest history, the bond report is also incorrect in stating that he was arrested on August 1 of 2024 for a misdemeanor of alien inadmissibility.  All that means is he was encountered at the border on August 1, 2024, when he presented himself at the port of entry under the CBP-1 app.  So he was not charged with a misdemeanor offense on August 1.  He was just encountered by CBP when he voluntarily presented himself at a Port of Entry.

Similarly, his arrested on 12/21 is just an immigration enforcement arrest.  It is not a charge for which severity is unknown.

My point being is that he entered legally, he complied with all of the obligations imposed upon him by the government, and was not subject to a final order of removal when he was apprehended.  It was just his parole had been revoked and the government did have a legal authority to take him into custody when they encountered him.

So, to me all those history and characteristics, of course, go to the fact that Mr. Rodriguez-Romero is not a risk of flight.  He has ties to the community with his wife and children.  Those ties include residence -- continuous residence for at least six months and presence in the United States for over a year and a half after his lawful entry.

With respect to the weight of the evidence, which is also a factor under 18 U.S.C. 3142(g), it's clear that the allegations against Mr. Rodriguez-Romero are based entirely on statements obtained from ICE officers who were involved in the incident.  No video has been obtained or any other corroboration.  It's not clear if his vehicle was even taken into evidence or photographs were taken.

And I point that out only to say that in my experience as defense counsel dealing with charges initiated by ICE, it is striking to me the lack of generation of reports, lack of evidence preservation, and lack of seeking corroboration of ICE statements as opposed to other federal law enforcement agencies or state or local authorities.

And in part, I think that's because generally deportation officers are -- just see themselves as the only civil immigration enforcement. When they then claim to encounter resistance and then criminal charges are filed, I don't think they have the training or experience to really document a case in the same way that we typically see in federal court.

Again, I make that point because I think there is a substantial basis to question the credibility of ICE officer testimony regarding allegations of assault.

I would make that point that U.S. Border Patrol Commander, Gregory Bovino, in a finding by U.S. District Court Judge Sarah Ellis out of the Northern District of Illinois found that he lied under oath in a deposition about being hit by rocks being thrown by legal observers.

There was also finding by Judge Ellis in the Northern District of Illinois that CB officer's testimony as to statements made during an incident were contradicted by video evidence.

There are allegations filed in this district in U.S. v. Suazo, 25-cr-457, charging Mr. Suazo with assault with his vehicle on ICE officers. I believe the U.S. Attorney's Office has been provided with and I have viewed video evidence which clearly contradicts those written allegations -- those verbal allegations by ICE officers.

I would also unfortunately have to refer to the killing of Rebecca [sic] Good yesterday where the President of the United States claimed:  "She ran him over."  Which I will proffer to you is entirely inconsistent with the video evidence.

That Department of Human Services -- I'm sorry, Department of Homeland Security Secretary Noem has called it an "act of domestic terrorism" which appears to be categorically false and political hyperbole.

I would say that it's a matter of public record that the federal government has been unable to obtain indictments in an astounding number of alleged assault cases across the country, particularly in Chicago and Los Angeles, where we previously saw the level of aggressive immigration enforcement that we are now seeing in Minneapolis.

And so I make all that to say that the weight of the evidence at this point to me is at least in equal folds. There are allegations being made by ICE agents.  It certainly establishes probable cause.  It certainly -- you can't challenge the indictment because we're not allowed to. But there is a basis for this Court to conclude that there is a campaign carried out for political reasons to portray ICE as being subject to an unprecedented level of assault by citizenry opposing their aggressive enforcement action.

That then in turn gives an underlying motive or reasoning as to why repeatedly across the country ICE and CBP officers have been found to give questionable or incorrect testimony that is contradicted by video evidence.

My only point being that the weight of the evidence is not a significant factor mandating detention here.

THE COURT:  So you've cited to a number of other cases that are not this case, right?  And so what I'm struggling with is, okay.  Accepting your proffer that ICE agents are not always credible and there's other cases that evidence that, do you have any information to suggest that the allegations in this case are incorrect?

MR. NESTOR:  Your Honor, I was appointed 48 hours ago.  I was provided an indictment with no factual information.  Approximately two hours ago I was provided with four written summaries of the government's investigation.  I have not been able to obtain any video evidence yet or canvas the neighborhood.  I believe some may exist.  I'll search for it.

But, so no, I do not have evidence to contradict the government's allegations other than to say that my client has pled not guilty, emphatically denies each and every allegation made by the government as to him intentionally assaulting or causing injury to an ICE

officer.

THE COURT:  Is it your position that he did not intentionally try to flee the ICE officer?

MR. NESTOR:  I think that from the testimony one could -- I think the white Dodge Durango that pulled behind him has no law enforcement markings on it.  That the ICE officers who existed their vehicles were covered with face masks from the eyes down.  That when Mr. Rodriguez-Romero did not show the proper degree of compliance, they immediately started to try to break out his windows, and that in a moment of panic he drove away intending to return to where he actually returned, the parking lot of his home.  That is not the same as fleeing for the purpose of evading arrest or evading law enforcement.  That's someone who's scared for their life because they've read for twelve months that ICE officers are arresting people and deporting them to torture prisons in El Salvador or abusing them and violating their rights through excessive use of force.

So while the evidence may show that he left the scene of the initial traffic stop, it's undisputed that he returned to where he started from that day, the parking lot of his residence.  That's not flight.

Moreover, it's triggered by a specific circumstance.  It's certainly different than being in court, having counsel appointed, and having an obligation to Your

Honor and the Court to appear for future court proceedings when he an incentive to do so, because he now understands, my having to explain to him, that he's eligible for legal permanent status.

So there's nothing here indicating that Mr. Rodriguez-Romero was seeking to avoid immigration enforcement as opposed to -- reacting -- reacting to that particular situation in a particular context of what's been happening in society, but most importantly is he returned to his own residence where he was initially located. And that's entirely inconsistent with an ultimate desire to try to avoid -- to try to flee and that he won't show up.

Much more, it does not establish that's a serious risk of flight or that conditions cannot ameliorate any concern that the Court may have.

THE COURT: What conditions would you suggest?

MR. NESTOR: The ones submitted to you by United States pretrial release in its proposed order of release. We have no objection to any of those orders.

So the government made a glancing reference to risk of flight, but I don't believe it has presented any evidence to establish a serious risk.

THE COURT: So let's talk about that because I don't read the statute the way you do and I want to hear more argument from the parties on this.

As I understand it, the factors apply whether or not this is a rebuttal presumption case. I've in fact applied these factors. Danger to the community. Risk of non-appearance. These are the factors that we always apply whether it's a rebuttal presumption case or not. And so the government's acknowledgement that it's not a rebuttal presumption case which likely stems from the fact that he doesn't have a criminal history in part; because as I read from subsection 18:3142(e), one of the factors to be considered is whether the judicial officer finds that the person has been convicted of a federal offense that is described in that section. He doesn't have a criminal history to speak of. You point that out yourself, Mr. Nestor. I agree with your assessment that the history that's documented in the bail report isn't particularly significant, and so he was on release pending trial, a period of not more than five years has elapsed.

So I -- on what basis are you arguing that the government's acknowledgement that it's not a rebuttal presumption case somehow means that somehow this automatically puts this into 3142(f)(2)? I don't think it does.

MR. NESTOR: So my position, Your Honor, would be that under the Bail Reform Act there's the presumption in favor of release.

THE COURT:  Of course.

MR. NESTOR:  Right.

THE COURT:  We always --

MR. NESTOR:  And that's why we have 3142(a) and (b) about release, when a person appears at their initial appearance.

Now at that initial appearance the government can move for detention, which it chose to do so in this case, and it chose to do so under (f)(2).

THE COURT:  I don't think it did.  I think that is inaccurate.  I was here.

MR. NESTOR:  That --

THE COURT:  I was here.  I saw Mr. -- I think it was Mr. Gilead.  Your colleague, Mr. Kanassatega, was standing here and he said -- I said, what factors?  He said (f)(1) and (f)(2).  He argued both.  And he said (f)(1) -- he said it's a crime of violence.

MR. NESTOR:  Yeah.  And, again, Your Honor, I was present.

THE COURT:  I have an independent recollection of this and I --

MR. NESTOR:  I respect your recollection but the government did not move -- continue with its effort too seek a detention hearing on that basis today under (f)(1).  It specifically said it was not a rebuttal presumption case

that --

THE COURT:  That doesn't mean that -- I don't think that "it's not a rebuttal presumption case" means that it's not an (f)(1) case.

MR. NESTOR:  Well, then we have a disagreement I think about the interpretation, right?

THE COURT:  Because I sit here every day, sir, that I'm on duty and we have many, many cases that are not rebuttal presumption cases and we apply (f)(1) routinely.

MR. NESTOR:  That being said, Your Honor, it's -- in my view, even if you apply these factors, what we have -- and it's an allegation disputed and denied by a not guilty plea based on testimony of ICE officers without corroboration as to a single incident where there was damage to two vehicles and potentially resistance to federal law enforcement.  To me that does not create even under the --

THE COURT:  Danger to the community.

MR. NESTOR:  Danger to the community by clear and convincing evidence --

THE COURT:  Right.

MR. NESTOR:  -- to support detention.

THE COURT:  Right.  Which is I think the standard that applies.

I'll hear from Mr. Kanassatega on the standard to be addressed.

MR. NESTOR:  And so, again -- and certainly not a risk of danger that cannot ameliorated by appropriate conditions of supervision.  And to the degree that the conduct is believed to have occurred by virtue of the indictment, it was isolated conduct based upon the particular circumstances of that day as opposed to a pattern in behavior or as opposed to someone engaged in ongoing criminality or with substance abuse problems or other matters that could trigger a greater risk of danger to the community.

So, again, our argument would be it was isolated behavior not likely to recur and certainly not while he is facing the potential of a prison sentence in understanding that he could be incarcerated if he fails to comply with conditions of -- or you know, violates the law in future ways while on pretrial release.

THE COURT:  All right.

MR. NESTOR:  So, in essence, we don't believe he's a risk of flight or a danger to the community or, more importantly, that the government has not met its burden of establishing the same and we would ask the Court to adopt the recommendations of United States pretrial release.

THE COURT:  Yeah, and I want to correct the record what I said before.  I mean, I see the danger to the community and risk of non-appearance factors do appear kind

of beneath Section 3142(f)(2), but this is the second section, the longer paragraph underneath that talks about what happens at the detention hearing.

So the distinction between the (f)(1) and (f)(2) factors really goes to whether or not there's a hearing at all. And I've already found that the government is entitled to a hearing based on the argument that this is a crime of violence. That's why we're having a hearing. Now that we're at the hearing the standard that applies is, Is he a danger to the community, or is there a risk of non-appearance? It is not a serious risk of flight.

MR. NESTOR: Sure.

THE COURT: That only applies at the initial appearance when we're talking about whether or not there's a risk of hearing.

MR. NESTOR: And if the Court believes if there was even a hint of those -- either of those exist, the question is whether the government has established that there are no conditions --

THE COURT: Correct.

MR. NESTOR: -- that can ameliorate those risks.

THE COURT: Yes, that is true.

Okay. Mr. Kanassatega, with all of that, what's your response?

MR. KANASSATEGA: From here or from the lecturn?

THE COURT: Please, from the lecturn.

MR. KANASSATEGA: Okay. Thank you, Your Honor.

As I was following your analysis there at the end with Mr. Nestor, my colleague, I agree that's my understanding of 3142 and the interplay of (f) -- subsections (f) and (g).

My understanding --

THE COURT: Right.

MR. KANASSATEGA: Of course I'm -- my understanding is that risk of flight -- a serious risk of flight and serious risk that the person will obstruct or attempt to obstruct, my understanding has always been that those trigger whether the government is entitled to a detention hearing.

THE COURT: Right.

MR. KANASSATEGA: And beyond that, once we're at the detention hearing, my understanding is that subsection (g) provides factors that the Court must determine --

THE COURT: Right.

MR. KANASSATEGA: -- must weigh to determine whether a person is a danger to the community safety or a risk of non-appearance.

THE COURT: That's my understanding as well. All right.

Were you going to argue the factors or are you

going to respond to what he said or are you done?

MR. KANASSATEGA:  I'm resting.

THE COURT:  Okay.  You're resting on your initial argument.  Okay.  All right.

One moment.

So, now that we've had testimony and the argument, I will reach my decision.

In considering the government's motion for a detention I am guided by several principles.

First of all, at all times the defendant is entitled to a presumption of innocence.  So, Mr. Rodriguez-Romero, whatever happens at today's hearing, whatever I state in my findings, nothing is intended to presume -- to affect that presumption of innocence at trial.  The purpose of this hearing is only to determine whether he should be detained pending trial.

Second, under the Bail Reform Act a defendant must be released before trial unless a judicial officer finds that no condition or combination of conditions exists that will reasonably assure the appearance of the defendant or the safety of any other person in the community.

Third, the Bail Reform Act, requires that I impose the least restrictive conditions necessary to provide those assurances and if I cannot find any condition or combination of conditions that will assure the appearance of the

defendant in these proceedings as required or the safety of others in the community, then I'm required to order that he be detained.  So that's the analysis that I have to follow.

Now, the government's position is that he should be detained both because he presents a risk of flight and because he is a danger to the community.

On the risk of flight factor.  The government must show that he is a risk of flight by a preponderance of the evidence.  And again, not just that he's a risk of flight, but that no condition or combination of conditions will reasonably assure his appearance in court in these proceedings as required.

The danger to the persons in the community argument that the government is making must be proved by a higher burden.  In this case, the government must show that he is a danger to the community by clear and convincing evidence.

There's also the question of whether or not this is a rebuttable presumption case.  I think we've had plenty of discussion about that already and neither party is claiming that this is a rebuttal presumption case and so, therefore, I find that this is not a rebuttal presumption case.

So I'm going to turn now to the factors that I have to consider under the Bail Reform Act that Mr.

Kanassatega pointed to just now.  And that is the nature and circumstances of the alleged offense, the weight of the evidence against the defendant, his history and characteristics, including his mental conditions, family ties, employment, length of residence in the community, any drug or chemical abuse, record of appearance in previous court proceedings, whether he was already on conditional release of some sort at the time of a new alleged offense. All of these are things that the Court takes into consideration, as well as the nature and seriousness of the danger to others or the community that might be presented by his release.

I have considered all of these factors and I've also taken into consideration the recommendation of the pretrial services officer in this case, which are documented in the bail report that I have in front of me, and in this case the pretrial services officer has recommended that he be released on conditions.

So I've taken that into consideration, and after considering all of that, considering the testimony that's in front of me, I find that the government has not met its burden to establish by a preponderance of the evidence that he presents a risk of flight.

On the basis for that determination, I am persuaded by the proffer that counsel made regarding his

ties to this particular community, his incentive to appear for proceedings to apply for legal permanent residence, and the fact that although he fled from the officers at the time of the event, it's not 100 percent clear to me that he knew who they were.  I understand that it was a frightening situation, and it could have been triggered by the circumstances of that particular incident.  He has no prior criminal history or history of flight, in contrast with many of the other cases that I have in front of me where I have multiple failures to appear in court.  There's no record of that here and so I do find that the government has not met its burden on that particular prong.

I'm also persuaded by the argument that defense counsel made that he was returning to his residence.  He certainly was not trying to hide or not doing a very good job of it.  If he was trying to hide from them, he wouldn't have gone back to the same apartment.

And then on the question of whether or not he's a danger to the community.  I find that the government has not met its burden by clear and convincing evidence to show that no condition or combination of conditions will reasonably assure the safety of others in the community.  And I look to his very clean criminal record.  There's very little here as compared to many of the other cases that we have.  He was in a charged situation when all of these events happened.  It

is, of course, not conduct that the Court would condone to go speeding down residential streets and crashing into cars, but I don't see a long history of having behaved in this way from this particular defendant and I understand that he may have felt a great deal of fear at the time it was precipitated by the particular circumstances in which he found himself.

And so for all of these reasons, I find that the government has not met its burden and I will release him on the conditions proposed by the pretrial services officer in this case.

So now I'm going to go through and read through those conditions because, sir, it is very important that you follow and comply with all of this; otherwise they will go out, they will find you, and your situation will be much, much worse.  You could be dealing with additional criminal charges; if you are in fact convicted of the offense with which you have in been in charge -- with which you've been charged in this case, your sentence could be longer; and, of course, you could have your release revoked and you could immediately be detained.

So for all of these reasons, it is incredibly important that you comply with all of these conditions.

Now I have a copy of the conditions for release in front of me.  First of all, you need to sign a personal

recognizance bond.  And this bond is basically your agreement that you're going to appear for court proceedings.  And in order to do that, it is critical that you stay in touch with Mr. Nestor here and that you always stay in contact and learn from him where you are supposed to go and at what time.

If you are convicted of this offense, you must surrender yourself to serve any sentence that might be imposed, and you must comply with all the other conditions that I'm about to read.

Now there are some standard conditions here.  You must not violate any federal, state or local law while you are on release.  You must cooperate in the collection of a DNA sample if one is authorized.

You must advise the Court or the pretrial services office in writing before making any change of your residence or telephone number.

You must appear in court as required and surrender yourself, as I said, if you're convicted.

And in addition to that, there's some other conditions here.

First of all, it's unclear to me where you will go once you're released.  You might be taken immediately into ICE custody.  If you are taken into ICE custody, if you are then released from ICE custody, then you must contact the

U.S. Probation and Pretrial Services Office and ask to speak to the duty officer right away. If you are released in the United States.

If, on the other hand, you are deported then that condition will not apply.

So, in other words, if you were released into another country -- I know this probably sounds obvious, but if they were to deport you to Cuba and you were released in Cuba, I'm not ordering you to call the pretrial services officer after you land in Cuba. I am simply ordering that if you are released in the United States from ICE custody you must immediately contact the pretrial services officer.

All right. You must not obtain a passport, visa, advance parole document, or refugee travel document or foreign travel document that would permit you to leave the United States.

Your travel will be restricted to Minnesota, unless your supervising officer approves otherwise.

You must not possess a firearm, destructive device or other weapon.

If you have any contact with law enforcement, you must contact the pretrial services officer and let me them know about it within 72 hours. This includes even minor things. If you get a traffic stop, don't question it. Just call to make sure that they're aware of what's going on.

You must reside at an addresses that they approve.

And you must comply with all immigration rules and regulations.

And if you are deported either voluntarily or involuntarily, you must not reenter the United States illegally.

Do you understand these questions, sir?

THE DEFENDANT: (Through Interpreter) Yes.

THE COURT: All right. I'm going to go ahead and have you go through the document with him. Make sure he sees it and you can go ahead and sign it.

Do you have a copy of that, Mr. Nestor?

MR. NESTOR: I did but I wrote on it, Your Honor, so.

THE COURT: Okay. I have a clean copy here.

(Pause in proceedings)

MR. NESTOR: Your Honor, Mr. Rodriguez-Romero has signed both the appearance bond and the release order with conditions of release after I reviewed them.

THE COURT: Okay. Great. Thanks. I will sign them and --

(Pause in proceedings)

THE COURT: All right, sir. You may be released after processing. I'm giving this to the clerk to file.

Is there anything further, Mr. Kanassatega?

MR. KANASSATEGA:  No, Your Honor.  Thank you.

THE COURT:  Anything else, Mr. Nestor?

MR. NESTOR:  Your Honor, I do have one other request and I've never made it before, so I'm not sure how the Court will react.

THE COURT:  We just probably know what it is.

MR. NESTOR:  But I have in recent cases -- I do expect that Mr. Rodriguez-Romero would be detained by immigration following his release from federal criminal custody.

THE COURT:  Yeah.

MR. NESTOR:  In recent cases, immigration has then transferred those individuals with pending criminal charges, in the District Court of Minnesota, has transferred them to detention facilities in Texas or other places, which interferes with the ability of counsel to prepare a defense, makes it difficult for Mr. Rodriguez-Romero to appear.

So, in terms of the Court's inherent authority and to preserve the effective assistance of counsel and his due process rights, I would ask that the Court further enter an order directing Immigration Customs and Enforcement, to not detain Mr. Rodriguez-Romero outside the District of Minnesota if they chose to detain him.

THE COURT:  I don't know that I have authority to

enter that order.

Mr. Kanassatega, do you have a position on this?

MR. KANASSATEGA:  I have no idea.

THE COURT:  I think this would take quite a bit of legal research for me to determine whether or not that's even something within my authority to enter, so I'm not inclined to enter that order today.

What I would suggest that you do if you would like such an order is to file a motion with the magistrate judge who is assigned to this case.

MR. NESTOR:  I will follow that instruction, Your Honor.

THE COURT:  Okay.

MR. NESTOR:  Nothing further.

THE COURT:  All right.  Court adjourned.

*                    *                    *

REPORTER'S DIGITAL CERTIFICATE

I, Lynne M. Krenz, do certify the foregoing pages of typewritten material constitute a full, true and correct transcript of the DIGITAL RECORDING, as they purport to contain, of the proceedings recorded at the time and place hereinbefore mentioned.

/s/Lynne M. Krenz
Lynne M. Krenz, RMR, CRR, CRC