UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-cr-497 (PAM/ECW)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JUAN CARLOS RODRIGUEZ
ROMERO,

        Defendant.

**Government's Consolidated
Response to Defendant's Motions**

A grand jury returned an Indictment charging the defendant, Juan Carlos Rodriguez Romero with two counts of assault on a federal officer with a dangerous weapon and one count of assault on a federal officer. The following motions are now before the Court:

| ECF No. | Motion |
|---|---|
| 29 | Motion for Hearing Regarding Destruction of Evidence |
| 30 | Motion to Suppress Custodial Interrogation Statements on 12/21/25 |
| 32 | Motion to Disclose Grand Jury Testimony |
| 34 | Motion for Examination and Disclosure of Government Agent/Witness Communications |
| 38 | Motion for Disclosure of Officer Conduct and Training |

The government responds to each of Mr. Rodriguez Romero's pretrial motions.

**STATEMENT OF FACTS**

On December 21, 2026, U.S. Immigration and Customs Enforcement Deportation Officers conducted enforcement operations in St. Paul, Minnesota and attempted to arrest Mr. Rodriguez Romero. Mr. Rodriguez Romero refused to comply with the officers' orders by fleeing a traffic stop, hitting a Deportation Officer with his vehicle, and biting another Deportation Officer's hand during arrest. A grand jury

Page **1** of **15**

returned an Indictment on December 30, 2026, charging Mr. Rodriguez Romero with two counts of assault on a federal officer with a dangerous weapon and one count of assault on a federal officer for his conduct.

## A. Count 1 – Assault on a Federal Officer with a Dangerous Weapon

Nine Deportation Officers ("DO") occupying three vehicles were conducting enforcement operations at an apartment complex by running license plates in the parking lot. The apartment complex is located on the 1300 block of Westminster Street. The officers identified a white Toyota 4Runner as being registered to Mr. Rodriguez Romero and learned that he was subject to removal from the United States.



*Apartment Complex on Westminster Street*

The officers observed the 4Runner exit the north entrance of the parking lot and travel north on Westminster Street. Six Deportation Officers in two of the vehicles followed Mr. Rodriguez. DO and Team Leader Juan Morales and DO Oscar Ibanez (identified as Victim #1 in the Indictment) occupied an unmarked blue Ford Expedition, which was equipped with emergency lights and sirens. DOs Tyler Baldwin (Victim #3 in the Indictment), Maceo Gamboa, Jonathan Chan, and Bethany Trombino (identified as Victim #2 in the Indictment) occupied an unmarked white

Dodge Durango, which was not equipped with emergency lights and sirens. DO Morales initiated the traffic stop by activating his emergency lights shortly after Mr. Rodriguez Romero exited the parking lot. Mr. Rodriguez Romero pulled over. DO Morales parked the blue Ford Expedition in front of Mr. Rodriguez Romer's 4Runner at an angle to block the 4Runner. The white Dodge Durango parked approximately six feet behind the 4Runner.

All officers exited their vehicles and wore body armor bearing either "ICE" or "POLICE" markings and badges. DO Morales identified himself as an immigration officer, told Mr. Rodriguez Romero that he had an order for his arrest, and instructed him to roll down his window. The other officers also instructed him to roll down his windows multiple times. Mr. Rodriguez Romero refused. DO Morales observed Rodriguez shake his head side to side while gripping the steering wheel. DO Baldwin observed Mr. Rodriguez Romero's eyes opened wide when Mr. Rodriguez Romero looked at their police markings. DO Morales also observed Mr. Rodriguez Romero turn the steering wheel to the right and reversed the 4Runner toward the sidewalk while almost hitting some officers. Mr. Rodriguez Romero then drove forward between the blue Ford Expedition and white Dodge Durango.

Count 1 does not allege that Mr. Rodriguez Romero made contact with DO Ibanez with his vehicle. The government was still investigating the incident at the time the grand jury returned the Indictment, and it was not clear whether Mr. Rodriguez Romero contacted DO Ibanez with his vehicle. The report of the interview of DO Morales stated that Mr. Rodriguez Romero "almost hit DO Ibanez, who had to

fall forward to avoid being hit." *See* Government Exhibit 1. However, the government interviewed DO Ibanez on February 23, 2026,[1] and DO Ibanez stated that Mr. Rodriguez Romero's vehicle hit his left shoulder with the driver side mirror. *See* Government Exhibit 2.

### B. Count 2 – Assault on a Federal Officer with a Dangerous Weapon

Mr. Rodriguez Romero then drove north on Westminster Street at approximately 55 to 60 miles per hour while officers pursued him. At some point, Mr. Rodriguez Romero drove around a block and drove south on Westminster Street and turned into the north entrance of the apartment parking lot. While entering the parking lot, officers observed Mr. Rodriguez Romero hit two parked vehicles and come to a stop on the north side of the apartment complex.

The officers exited their vehicles again, drew their firearms, approached the 4Runner, and commanded Mr. Rodriguez Romero to exit the vehicle. DOs Ibanez and Trombino approached the front of the 4Runner. However, Mr. Rodriguez Romero refused to exit the vehicle. Instead, he accelerated toward DOs Ibanez and Trombino. Mr. Rodriguez Romero struck DO Ibanez with the front of his 4Runner, and DO Ibanez fired two shots in the vicinity of the 4Runner. Mr. Rodriguez Romero continued to drive further into the apartment parking lot.

---

[1] The government's case agent—Homeland Security Investigations Special Agent Michael Raiff—and other investigators were unable to interview DO Ibanez prior to February 23, 2026, because U.S. Immigration and Customs Enforcement were investigating DO Ibanez's discharge of his firearm, which is described below.

## C. Count 3 – Assault on a Federal Officer

The vehicular pursuit ended on the east side of the apartment complex when the 4Runner struck the blue Ford Expedition. The white Dodge Durango then struck the 4Runner from behind.[2] Mr. Rodriguez Romero exited the 4Runner and ran into the apartment building. DOs Morales, Baldwin, and Trombino pursued Mr. Rodriguez Romero on foot into the apartment complex and attempted to arrest him. The officers commanded Mr. Rodriguez Romero to stop resisting, but Mr. Rodriguez Romero refused to give officers his hands. The officers forced Mr. Rodriguez Romero to the ground, but he still refused to give officers his hands. DO Baldwin applied a pressure point technique to Mr. Rodriguez Romero's head to obtain compliance, but Mr. Rodriguez Romero turned his head and bit DO Baldwin's left hand, which pierced his skin and drew blood.

### GOVERNMENT'S RESPONSES TO MOTIONS

## A. Motion for Hearing Regarding Destruction of Evidence [ECF No. 29]

The defendant moves the Court for hearing to address issues of how the government seized and maintained Mr. Rodriguez Romero's Toyota 4Runner, the blue Ford Expedition, and the white Dodge Durango for evidentiary purposes and how alterations were made to the vehicle.

---

[2] DO Ibanez exited the passenger side of the blue Ford Expedition just before the white Dodge Durango struck Mr. Rodriguez Romero's 4Runner from behind. As the government understands the sequence of events, the white Dodge Durango caused the 4Runner to move forward and pin DO Ibanez against the inside of the blue Ford Expedition's passenger door. DO Ibanez suffered a dislocated finger during this event. The indictment therefore does not charge Mr. Rodriguez Romero for this sequence of events.

A hearing is not necessary to determine these issues. The government has conferred with Mr. Rodriguez Romero's counsel, and it is the government's understanding that the 4Runner's front bumper was already missing moments after the vehicular pursuit ended on the east side of the apartment complex.



*Screenshot of video depicting arrest of Mr. Rodriguez Romero.[3]*

---

[3] The defense obtained a video from a bystander depicting the officers arresting Mr. Rodriguez Romero inside the apartment complex and securing him inside the blue Ford Expedition.

The government objects to the defendant's request to inspect the blue Ford Expedition and white Dodge Durango because—although the vehicles have remained at the Bishop Henry Whipple Federal Building since December 21, 2025, have not been operated, or examined—the vehicles are not material to preparing a defense and the government does not intend to use the vehicles or evidence obtained from an examination of the vehicles in its case-in-chief at trial. *See* FED. R. CRIM. P. 16(a)(1)(E). As discussed previously, the government has clarified to Mr. Rodriguez Romero that the Indictment does not charge him for any conduct surrounding the collision involving the three vehicles on the east side of the apartment complex that resulted in DO Ibanez's dislocated finger. The Court should therefore deny Mr. Rodriguez Romero's motion for a hearing.

## B. Motion to Suppress – Custodial Interrogation Statements on December 21, 2025 [ECF No. 30]

The defendant moves the Court for an order to suppress all statements made by Mr. Rodriguez Romero in response to a custodial interrogation on December 21, 2025, following his arrest by federal agents. The government agrees to suppress all such statements.

## C. Motion to Disclose Grand Jury Testimony [ECF No. 32]

The defendant moves the Court for an order to disclose the grand jury testimony presented by the government to obtain the Indictment in this matter on the ground that the government presented false testimony to the grand jury. The government respectfully asks the Court to deny this motion.

"[G]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden." *United States v. Wilson*, 565 F.3d 1059, 1070 (8th Cir. 2009) (quoting *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir.1986). "The remedy of dismissal for an Indictment due to grand jury abuse is appropriate only upon a showing of actual prejudice to the accused." *Id*. (quoting *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir.1987)). Accordingly, a party seeking disclosure of a grand jury transcript must show a "particularized need." *United States v. Wilkinson*, 124 F.3d 971, 977 (8th Cir. 1997). Here, Mr. Rodriguez Romero has failed to show a particularized need because he has not suffered actual prejudice.

The Indictment is consistent with the facts. On December 21, 2025, Special Agents with Homeland Security Investigations interviewed Team Leader and Deportation Officer Juan Morales. The Special Agents' report of their interview of DO Morales stated that Mr. Rodriguez "drove forward in between both the [vehicles] and almost hit DO Ibanez, who had to fall forward to avoid being hit." *See* Government Exhibit 1. On February 13, 2026—45 days after the grand jury returned the Indictment—HSI Special Agent Michael Raiff interviewed DO Ibanez. SA Raiff's report states that "as the [o]fficers went to break the window, the subject vehicle took off and struck his left upper arm with the drivers side mirror." *See* Government Exhibit #2. The interview with DO Ibanez occurred after the grand jury returned an Indictment against Mr. Rodriguez Romero. The government has not sought a Superseding Indictment in light of the interview with DO Ibanez.

As to Count 2, the Eighth Circuit Model Jury Instructions for 18 U.S.C. § 111 refer to the definition of "bodily injury" located at 18 U.S.C. 1365(g)(4), which defines "bodily injury", in relevant part, as "physical pain…[and] any other injury to the body, no matter how temporary."[4] JUDICIAL COMMITTEE ON MODEL JURY INSTRUCTIONS FOR THE EIGHT CIRCUIT, MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT at 162 (2003). During his interview, DO Ibanez described the pain he felt as a "five" on a scale of 1 to 10 after being struck by Mr. Rodriguez Romero's vehicle on the north side of the apartment complex.[5]

The government respectfully asks the Court to deny this motion. Mr. Rodriguez Romero has not suffered actual prejudice because the counts in the Indictment accord with the facts known to the government at the time. The fact that the government, based on new information, may seek additional allegations does not affect the viability and legality of the present Indictment. Because Mr. Rodriguez Romero has failed to demonstrate a particularized need for disclosure, the Court should respectfully deny the motion.

## D. Motion for Disclosure of Government Agent/Witness Communications [ECF No. 34]

The defendant moves the Court to order the government examine communication devices and electronic communications possessed and used by the Deportation Officers from December 21, 2025, through February 12, 2026 and to disclose any communications or contacts relevant to their anticipated testimony or

---

[4] The government has clarified to Mr. Rodriguez Romero that the indictment does not charge the facts surrounding DO Ibanez's dislocated finger.
[5] The government provided the audio recording of DO Ibanez's interview on February 19, 2026.

which would constitute *Brady* or *Giglio* material. The government agrees to examine all cell phones, communication devices, and electronic communications of Deportation Officers Morales, Ibanez, Trombino, Baldwin, Gamboa, and Chan and will disclose communications that are consistent with its constitutional obligations under *Brady* and *Giglio* and under Rule 16 of the Federal Rules of Criminal Procedure.

**E. Motion for Disclosure of Officer Conduct and Training [ECF No. 38]**

The defendant moves the Court to order the government to disclose the following materials as to DOs Morales, Ibanez, Trombino, Baldwin, Chan, Gamboa: (1) identifying information that is in addition to the reports that have already identified the nine Deportation Officers; (2) photographs of members of the public the Deportation Officers may have taken; (3) lists of persons arrested or detained by the Deportation Officers; (4) all narrative reports or recorded statements of the Deportation Officers during their deployment to Minnesota not related to this matter; (5) video footage of the Deportation Officers using force during their deployment to Minnesota; (6) records of the Deportation Officers' assigned areas of operation during their deployment to Minnesota; and (7) use of force reports, complaints, history of disciplinary actions, and criminal history.

The defendant also moves the Court to order the government disclose the following materials generally: all Department of Homeland Security policies, including U.S. Immigration and Customs Enforcement policies, regarding: (1) the use of "pressure point techniques"; (2) the use of deadly force; (3) reporting the use of deadly force; (4) use of firearms; and (5) implementing traffic stops.

Finally, the defendant moves the Court to order the government to disclose the training records of DOs Ibanez and Baldwin.

### 1. Information Related to Identification and Deployment

The government will fully comply with its discovery obligations under *Brady* and *Giglio* and will disclose any evidence favorable to the defendant. However, the government objects to providing: (1) identifying information that is in addition to the reports that have already identified the nine Deportation Officers; (2) photographs of members of the public the Deportation Officers may have taken; (3) lists of persons arrested or detained by the Deportation Officers; (4) all narrative reports or recorded statements of the Deportation Officers during their deployment to Minnesota not related to this matter; (5) video footage of the Deportation Officers using force during their deployment to Minnesota; and (6) records of the Deportation Officers' assigned areas of operation during their deployment to Minnesota. Such evidence is not material to preparing a defense, particularly as to the defense that Mr. Rodriguez Romero was not aware that the Deportation Officers were law enforcement officers. First, the officers initiated a traffic stop with emergency lights, and Mr. Rodriguez Romero complied by pulling over. Second, the officers wore either vests displaying law enforcement markings, badges, or both. Third, the Supreme Court held in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), that law enforcement officers do not violate the Fourth Amendment when ordering individuals to exit their vehicles. Here, Mr. Rodriguez Romero refused to listen to the officers' multiple commands to roll down his window to speak with them.



*From left to right: Deportation Officers Gamboa, Tyler Baldwin, and Bethany Trombino. All three officers were present during the first traffic stop and wearing vests bearing police markings.*

2. *Use of Force Reports, Complaints, History of Disciplinary Actions, and Criminal History.*

The Fifth Amendment Due Process Clause "requires the government to disclose to the accused favorable evidence that is material to guilt or punishment," and *Giglio* held that "disclosure of evidence affecting the credibility of a witness falls

within this rule." *United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (citing *Brady* and *Giglio*).  It follows then, that disclosure of impeachment material, like *Brady* material, is timely if it is produced in time for use at trial.  *See United States v. Jeanpierre*, 636 F.3d 416, 422 (8th Cir. 2011) (citing *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) ("*Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial.").

Here, the Court has already ordered the government to turn over *Brady* and *Giglio* information in its Case Management Order. ECF No. 27 at 3. The government has complied with that Order and will continue to do so. Specifically, the government understands its obligation to disclose impeachment evidence for its testifying witnesses and will comply with disclosure before trial in accordance with this Court's order.  However, the government declines to provide any such material with respect to persons who will not be called as witnesses, as such a request is beyond the scope of *Brady*, *Giglio*, and their progeny.  *See, e.g., United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (providing that "because . . . *Giglio* appl[ies] only to impeachment information relating to a government witness," it was inapplicable to a confidential informant whom the government never called as a witness); *see also United States v. Eisenberg*, 469 F.2d 156, 160 (8th Cir. 1972); *Miller*, 698 F.3d at 704 (addressing motion under Fed. R. Crim. P. 16(a)(1)(E)(i)).

3. *Department of Homeland Security Polices*

The government has requested all Department of Homeland Security policies, including U.S. Immigration and Customs Enforcement policies, regarding: (1) the use of "pressure point techniques"; (2) the use of deadly force; (3) reporting the use of deadly force; (4) use of firearms; and (5) implementing traffic stops.

4. *Training Records*

The training records for DOs Ibanez and Baldwin are not material to preparing a defense. At most, the training records would constitute *Giglio* material. The government will disclose such evidence in advance of trial in accordance with applicable law.

## CONCLUSION

The government respectfully asks the Court to issue order consistent with the government's responses to Mr. Rodriguez Romero's motions. A hearing is not necessary, and the Court may determine the motions based on the parties' filings.

Dated:  March 13, 2026                          Respectfully Submitted:

                                        DANIEL N. ROSEN
                                        United States Attorney

                                        s/ *Syngen Kanassatega*

                                BY:   SYNGEN KANASSATEGA
                                        GARRETT S. FIELDS
                                        Assistant United States Attorneys