UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No: 25-CR-497(PAM/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MOTION FOR** |
| v. | ) | **DISCLOSURE OF USE OF** |
| | ) | **FORCE INVESTIGATION** |
| JUAN CARLOS RODRIGUEZ ROMERO, | ) | **RECORDS** |
| | ) | |
| Defendant. | ) | |

Defendant, Juan Rodriguez Romero, by and through counsel Bruce D. Nestor of De León and Nestor, LLC states as follows in support of his Motion to for Disclosure of Use of Force Investigation Records:

1. During the course of detaining Juan Rodriguez Romero on December 21, 2025, the Government alleges that Immigration and Customs Enforcement (ICE) Deportation Officer Oscar Ibanez discharged his government issued firearm and fired two shots at a vehicle occupied by Mr. Rodriguez Romero.

2. The location and circumstances under which DO Ibanez discharged his firearm are disputed and DO Ibanez and other Deportation Officers involved in the detention of Mr. Rodriguez Romero have given contradictory statements about the location, timing, and circumstances under which the shooting occurred. The Government asserts that Mr.

1

Rodriguez Romero struck DO Ibanez two or three times with his vehicle, thus causing DO Ibanez to fear for his life and discharge his firearm.

3. The Government's disclosures to date indicate that DO Ibanez gave his first statement about the events of December 21, 2025, on February 13, 2026, during an interview with Homeland Security Investigations (HSI) Special Agent Michael Raiff. DO Ibanez was accompanied to this interview by his personal legal counsel.

4. In its Consolidated Response to Defendant's Motions (ECF #40) filed March 13, 2026, the Government asserts that HSI agents were unable to interview DO Ibanez until fifty-four days after the shooting on December 21, 2025, "because U.S. Immigrations and Custom Enforcement were investigating DO Ibanez's discharge of his firearm." *Id.* p 5 of 15, fn. 1.

5. On April 9, 2024, the Government disclosed to undersigned counsel various "use of force" policies of ICE and the Department of Homeland Security (DHS). In pertinent part, those policies require:

    a. That all use of force be documented and investigated pursuant to ICE Directive 19009.3, Firearms and Use of Force (May 26, 2023). As part of their official duties, ICE employees are required to complete reports describing actions taken in an official capacity.

    b. That ICE employees "will generally not be compelled to produce a statement in the case of an active criminal investigation."

    c. That ICE will report use of force incidents and data involving "any use of deadly force against a person, to include when a firearm is discharged at a person."

d. Authorized Officers must report must provide a verbal report of any incident involving the use of deadly force to their immediate supervisor within one hour of the time a use of deadly force occurs, or as soon as is practical. Such a report must include the time date and location of the incident; the names of authorized officers present; subject information; weapons used; nature of the enforcement action that resulted in the use of deadly force; witness information; injuries sustained by any person; property damage.

e. Upon receipt of notification of a use of deadly force, the supervisor must make a verbal report of the incident through the appropriate chain of command, to the Office of Professional Responsibility (OPR), and to the ICE Joint Intelligence Operations Center.

f. The supervisor must ensure that local law enforcement authorities are notified of incidents involving property damage, bodily injury, or death.

g. The supervisor must follow up the initial verbal report with a written report, containing all relevant information. This report must be sent to OPR, the Office of Firearms Training Program (OFTP), and the appropriate chain of command within 48 hours of the incident.

h. If the discharge of a firearm results in injury or property damage, regardless of how minor, the firearm and ammunition must immediately be sent to OFTP for examination.

i. An ICE officer involved in the use of deadly force must be provided psychological first aid services and be immediately placed on administrative leave for three consecutive workdays.

j. That deadly force may be used against a subject only when the subject poses an imminent danger of serious bodily injury or death to an officer or another person and may not be used solely to prevent the escape of a fleeing subject.

6. On April 1, 2026, undersigned counsel wrote Assistant United States Attorney Syngen Kanassatega and requested the following disclosures relevant to the above use of force policies and reporting requirements:

3

*Use of Force Investigation* – *The Government's Consolidated Response to Defendant's Motions (ECF #4), states in fn. 1 on page 5 that DO Ibanez was not interviewed prior to February 23, 20261, because ICE was "investigating DO Ibanez's discharge of his firearm." The Government has made no disclosures with respect to this "use of force' investigation. Please disclose a complete copy of all records associated with the investigation, including any witness interviews, physical evidence collected, and expert examinations including any examination of DO Ibanez's firearm. Please provide a date certain prior to April 29, 2026, by which the report will be disclosed*

7. By email dated April 20, 2026, AUSA Kanassatega replied as follows:

   ***Use of Force Reports***
   *Enforcement and Removal Operations informed us that the officers did not submit use of force reports. Further, ICE's Office of Professional Responsibility informed us that it does not publish critical incident reports until judicial proceedings have concluded.*

8. The Government's filings in this matter are contradictory and confusing with respect to whether a use of force investigation was conducted. On March 13, 2026, the Government clearly represented that an investigation was occurring which had delayed the ability to interview DO Ibanez until February 13, 2026. The Government's email of April 20, 2026, both implies that no investigation was conducted because no use of force reports were submitted and also that ICE's Office of Professional Responsibility is conducting a "critical incident" investigation that is has not yet published.

9. Mr. Romero Rodriguez contends that the contradictory statements given by the DO's involved in the detention of Mr. Rodriguez Romero regarding the location, timing, and circumstances of DO Ibanez's use of deadly force are

4

indicative of actions to cover-up a "bad shooting" where DO Ibanez did not have an actuyal fear for his life and safety because he was not threatened or assaulted by Mr. Rodriguez Romero. The failure to report the use of force as required by DHS/ICE policy, or any information reported, or any interviews of the agents involved, or any examination of DO Ibanez's firearm, would all be material to this potential defense.

10. Defendant moves that the Court order the Government to conduct a fulsome search and make inquiry of the ICE agents involved in the December 21, 2025, incident with Mr. Rodriguez Romero, of their supervisors, of the ICE Office of Professional Responsibility, and of the Acting ICE St. Paul Field Office Director, for the following documents and records and to the existence of non-existence of each category of records sought:

   a. Any documentation related to any verbal report of the use of force by DO Ibanez on December 21, 2025, during the incident involving Mr. Rodriguez Romero;

   b. Any documentation related to a supervisor of DO Ibanez receiving a verbal notification of his use of deadly force and of any verbal report by that supervisor to OPR and the ICE Joint Intelligence Operations Center;

   c. Any notification by any federal official to local law enforcement authorities of an incident on December 21, 2025, resulting in property damage or injury as a result of the use of deadly force by DO Ibanez;

   d. Any documentation related to any written report by a supervisor of DO Ibanez, or any other government official, to OPR, OFTP, and the appropriate ICE chain of command;

5

e.  All documentation related to the collection of transfer of DO Ibanez's firearm to OFTP for examination;

f.  All documentation related the examination of DO Ibanez's firearm by OFTP, including the examination of any shell casings, ammunition, or damage caused by the discharge of DO Ibanez's firearm;

g.  All documentation related to the provision of psychological first aid services to DO Ibanez and to DO Ibanez being placed on administrative leave for three consecutive workdays;

h.  All documentation related to an interviews as part of any use of force investigation of any Deportation Officer or agent who witnessed or had knowledge related to the December 21, 2025, use of force by DO Ibanez;

i.  All documentation related to any attempts by HSI agents or other government officials to interview DO Ibanez prior to February 13, 2026, and all documentation related to any reason that such interviews could not be conducted prior to February 13, 2026, based on the investigation by ICE of DO Ibanez's discharge of his firearm;

j.  All documentation related to any investigation, or non-investigation, by ICE of DO Ibanez's discharge of his firearm on December 21, 2025.

11. Mr. Rodriguez Romero requests that in making any responsive disclosures to the matters listed above, that that Government also be required to detail its efforts to locate and obtain responsive records, the government officials contacted or of whom inquiry was made, and whether any documents not disclosed have been identified as having been created or maintained by any other government agency or official.

6

Date: <u>May 18, 2026</u>                    <u>        S/BRUCE D. NESTOR        </u>
Bruce D. Nestor, 0318024 – MN
DE LEÓN & NESTOR, LLC
3547 Cedar Avenue South
Minneapolis, MN  55407
(612) 659-9019
(612) 436-3664 – Facsimile
nestor@denestlaw.com

ATTORNEY FOR JUAN RODRIGUEZ
ROMERO